Richard JACKSON, Appellant,

v.

ST. JOSEPH STATE HOSPITAL, et al., Appellees.

No. 86–2595.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1987.

Decided March 1, 1988.

Rehearing and Rehearing En Banc Denied May 23, 1988.

Samuel I. McHenry, Kansas City, Mo., for appellant.

Mary Stewart Tansey, Asst. Atty. Gen., Jefferson City, Mo., for appellees.

Before McMILLIAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit

Judge, and BEAM [*], Chief District Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Richard Jackson appeals from an order of the district court [1] entering judgment in favor of defendants in this Title VII case. The district court found that Jackson's reverse sex discrimination claim was untimely and that his retaliatory discharge and due process claims were not supported by the evidence. On appeal Jackson challenges the district court's order pertaining to retaliatory discharge and due process. We affirm.

## I. BACKGROUND

In May 1975 Jackson was hired by St. Joseph State Hospital as its chief accountant to correct problems which had developed in the preparation of medicare cost reports. As early as 1977 the hospital administration began receiving complaints about Jackson and the low morale in the accounting department. Jackson's subordinates complained that he would discuss one employee's private life with other employees. One employee filed a grievance claiming that Jackson was disruptive, agitated one employee against another, and created a stressful work environment. Complaints about Jackson were also made to state legislators.

In May 1978 a meeting was held to discuss changes to be made in the accounting department. The key supervisors in the department were present, but Jackson declined to attend. Hospital superintendent Dr. Nicholas Bartulica continued to receive complaints about Jackson, so a second meeting was held in late May. Jackson preferred not to attend and stated that further complaints should be put in writing. Jackson's request was communicated to his subordinates, but no written complaints were received by the administration.

In July 1978 the accounting department was audited by the Department of Mental Health. The chief auditor found that Jackson's managerial style was causing morale problems in the accounting department. Jackson was informed that disciplinary actions would be taken if he did not correct the problems in his department.

In October 1978 Jackson's secretary filed a grievance against him stating that he frequently discussed employees' personal lives, that he had problems communicating, and that he frequently called her into his office on Friday afternoons to criticize and demean her. At a meeting between Jackson, the secretary, and Dave Farrar, the assistant superintendent for administration, Jackson became angry and stated that he would run the secretary out of his department. As a result of Jackson's conduct Farrar informed him that if he did not change his ways he would risk losing his position as department head.

Complaints about Jackson abated until January 1982 when Roxanne Kuhn filed an internal complaint against him alleging harassment. Several months before the complaint was filed Jackson had begun inquiring into Kuhn's personal life. He told Kuhn that he did not approve of her black boyfriend and that she should not expect any promotions while the relationship continued. Also, Jackson stated that he disapproved of the fact that Kuhn's children lived with her ex-husband. Kuhn's complaint also stated that Jackson frequently touched or grabbed her.

On the same day that Kuhn filed her complaint Jackson requested that she be suspended for one day with pay for failing to complete certain reports. Dr. Bartulica met individually with Kuhn and Jackson to discuss a compromise. Kuhn agreed to withdraw her complaint subject to reinstatement if the harassment continued and Jackson agreed to withdraw his request for suspension after being told that the request would not be supported by the hospital administration.

[*] The Honorable C. Arlen Beam, United States Chief District Judge for the District of Nebraska, sitting by designation.

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

On June 4, 1982 Jackson went to Kuhn's office to discuss work related matters, but she was not there. He eventually found her sitting in Rhonda Mahoney's office with her back to the door. Jackson approached Kuhn from behind and placed his hands on her shoulders and did not remove them until she stood up and left the room. On June 9 Jackson called Kuhn into his office to discuss her drinking habits.

On June 10 Kuhn filed another complaint against Jackson citing the June 4 and June 9 incidents. On July 14 Jackson was issued a reprimand and directed not to place his hands on female employees, make inquiries into or discuss employees' private lives, or counsel or discipline female employees without a witness present. In response, Jackson filed an internal complaint alleging sexual discrimination. The division director found against him on October 1, 1982 and on November 17 Jackson filed complaints with the Equal Employment Opportunity Commission (EEOC) and the Missouri Commission on Human Rights. Jackson was advised by the hospital administration that suspension was being considered if he did not cooperate and shortly thereafter he was suspended for three days without pay.

On January 10, 1983 Jackson was notified by the EEOC that a fact finding conference had been scheduled for January 27. In preparation for the conference, Jackson approached Rhonda Mahoney regarding the June 4 incident in her office. Jackson wanted proof that his touching of Roxanne Kuhn was not sexual in nature. During a forty-five minute conversation Mahoney repeatedly told Jackson that she had already given a statement and that she did not think it was proper to discuss the incident further. Later that day Jackson again approached Mahoney and requested a statement. Mahoney became so upset that she left work for the remainder of the day.

On January 26, two days later, Jackson gave Mahoney a prepared statement and asked her to review it, make any changes necessary, and sign it. It stated that Mahoney did not remember what happened in her office on June 4. Mahoney refused to

sign the statement and complained to Jackson's supervisor that if Jackson did not leave her alone she would lodge a formal complaint of harassment. Later that day Jackson was put on administrative leave with pay pending investigation of the incident with Mahoney.

On February 17, 1983 Jackson was issued a dismissal letter which read, in part, as follows:

> For the reasons indicated herein, you are hereby notified of your dismissal from employment with St. Joseph State Hospital, effective February 28, 1983 at the close of business. This action is being taken subject to your right to show reasons why this dismissal shall not be effected. You may answer in person at my office between the hours of 8:00 a.m. and 4:30 p.m. on or before February 25, 1983 or you may present your case in writing delivered to my office on or before the same date. The specific reasons for your dismissal are your inadequacy and inefficiency in the performance of the duties of your position, in that you have willfully exhibited behavior which is disruptive to the working activities of other employees. On Monday, January 24, 1983 you approached Rhonda Mahoney at work attempting for approximately 45 minutes to get her to change the statement she made concerning an event she observed involving you and another employee on June 4, 1982. On Wednesday, January 26, 1983 you presented a handwritten memo to Ms. Mahoney, which was written as if in her own words and stated that her memory was unclear as to the events that transpired on June 4, 1982 and you wanted Ms. Mahoney to sign the memo. You told Ms. Mahoney you would use the statement at a future hearing. Such acts constitute harrassment [sic] of an employee, and are willfully disruptive of the work activities of the employee and others.

Jackson's written response was rejected by the hospital and his dismissal was affirmed by the Personnel Advisory Board. He filed this lawsuit on October 9, 1984 alleging sexual discrimination, retaliatory

discharge, and a due process violation. The district court found for the hospital on all three claims.

## II. DISCUSSION

■ Title VII protects an employee pursuing an EEOC complaint from retaliatory actions by his employer. 42 U.S.C. § 2000e–3(a). In order to establish a prima facie case of retaliatory discharge Jackson must prove that 1) he was engaged in statutorily protected activity, 2) he suffered adverse employment action, and 3) a causal connection between the two exists. *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).

■ The district court found that Jackson failed to establish a prima facie case because his conduct in pursuing a statement from Mahoney was not protected activity as it was "bizarre." Jackson argues that the cases cited by the district court, *Garrett v. Mobil Oil Corp.*, 531 F.2d 892 (8th Cir.), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976), and *E.E.O.C. v. Shoney's, Inc.*, 536 F.Supp. 875 (N.D.Ala.1982), are inapplicable because the conduct of the plaintiffs in those cases was unreasonable whereas his own conduct was reasonable.

In *Garrett* an employee pursuing an EEOC complaint refused direct orders, left her work station, and barged in on meetings of managerial personnel. In *Shoney's* an employee neglected his job for three days while pursuing an EEOC complaint. Jackson argues that the time he spent pursuing a statement is reasonable when compared to *Shoney's* and his "polite efforts" can not be compared to those in *Garrett*. This argument, however, overlooks several important facts.

First, although Jackson's own efforts did not take more than a few hours, additional work time was lost when he had his secretary typing and copying documents for him on hospital time and when he disturbed Mahoney so greatly that she left work early on January 24, 1983. Second, Jackson's pursuit of a statement can not be characterized as polite. Once Mahoney stated that she did not want to make a statement to him, Jackson should have left her alone. Mahoney had already given a statement to EEOC. Furthermore, since the EEOC has subpoena power, Jackson had other less objectionable and disruptive avenues open for obtaining Mahoney's testimony. Also, Jackson's repeated assertions to Mahoney that her memory of the June 4 incident was incorrect was entirely out of line and was aptly perceived by the district court to be "bizarre", and was an abusive attempt to have Mahoney change her views of the incident in her office.

Further, Jackson had a long string of complaints and reprimands preceding his termination. The mere act of filing an EEOC complaint does not render illegal all subsequent disciplinary actions taken by the hospital. As the district court noted, Jackson's conduct in pursuing a statement from Mahoney was the "last straw." He was fired for pursuing a statement in a highly offensive and disruptive manner after repeated warnings that he needed to change the way in which he dealt with subordinates. To require the hospital to overlook Jackson's past simply because he filed an EEOC complaint would unduly hamper the hospital's right to make employment decisions. Likewise, it would be unreasonable to hold that while on the state payroll Jackson had a federally protected right to harass Mahoney to the point that she had to leave work. *See Hochstadt v. Worcester Foundation*, 545 F.2d 222, 230–34 (1st Cir.1976) (plaintiffs conduct exceeded scope of protection offered by Title VII).

The dissent states that Jackson's conduct fell far short of that exhibited by the plaintiffs in *Garrett* and *Shoney's*. Whether Jackson's actions were as egregious as in these cases is, of course, subject to differing opinions. However, merely stating that *Garrett* and *Shoney's* have more compelling facts does not decide the issue whether Jackson's conduct is protected. *Garrett* and *Shoney's* do not represent the minimum degree of "bizarreness" which must be shown before a Title VII plaintiff will be stripped of his statutory protection.

They are only examples of conduct which resulted in such a loss.

Title VII protection from retaliation for filing a complaint does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct in dealing with subordinates and with his peers. The public and the state should not have to suffer waste of public funds in countenancing the arrogant and bizarre conduct exhibited by Jackson. Department heads should strive to create harmonious relationships amongst subordinates and working personnel rather than discord, personal humiliations, and chaos. Jackson's record of performance was not only inferior but atrocious in making unreasonable demands on subordinates, creating inefficiency in department operations, wasting state resources, and in his personal harassment of Mahoney. The aforementioned conduct is not protected nor should it be countenanced by the salutory purposes set forth in Title VII.

▮ Jackson also argues that due process was violated because his termination letter indicated that the decision to terminate had already been made. All he was given was an opportunity to convince Dr. Bartulica to change his mind and rescind the termination. Jackson argues that his hearing should have preceded the decision to terminate rather than the effective date of termination.

Due process, however, does not require predecision hearings. It only requires an opportunity to be heard prior to the termination of benefits. In the present case, Jackson was given written notice of his termination on February 17, 1983. The reasons for termination were clearly set forth in this letter. Accompanying the notice were statements made by hospital employees explaining Jackson's inadequacies. And, more significantly, the notice stated that Jackson's termination was not effective until February 28, 1983 and until then he would continue to receive full pay.

These facts closely resemble those in *Bignall v. North Idaho College*, 538 F.2d 243 (9th Cir.1976), where a part-time col-

lege instructor brought suit challenging the college's decision not to renew her employment contract. Bignall argued that due process required that she be given a hearing before the decision was made not to renew her contract. The Ninth Circuit disagreed and held that "a pre-termination hearing is not a hearing held prior to any decision to terminate, * * * but rather a hearing held prior to a termination of benefits ..." *Id.* at 246 (quoting *Chung v. Park*, 514 F.2d 382, 386 n. 7 (3rd Cir.), *cert. denied*, 423 U.S. 948, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975)). *See also Vance v. Chester County Bd. of School Trustees*, 504 F.2d 820, 824–26 (4th Cir.1974) (due process requires hearing prior to termination of benefits rather than decision not to renew contract).

In the present case Jackson's benefits—his salary—were not terminated until February 28, 1983. From February 17 until February 28 he had the opportunity to present his case and on February 23, 1983 he made a written response to the dismissal letter. Because Jackson was given the opportunity to be heard prior to the termination of his salary, his due process rights were not violated.

## III. CONCLUSION

Because we hold that Jackson established neither a prima facie case of retaliatory discharge nor a due process violation, the order of the district court entering judgment in favor of the defendants is affirmed.

McMILLIAN, Circuit Judge, concurring in part and dissenting in part.

I concur in part and respectfully dissent in part. I concur in that part of the majority's opinion which found there was no due process violation; however, I do not agree that appellant did not make out a prima facie case of retaliatory discharge.

As the majority opinion recognizes, to establish a prima facie case of retaliatory discharge appellant has to prove that (1) he was engaged in statutorily protected activi-

ty, (2) he suffered an adverse employment action, and (3) a causal connection existed between the two. *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied,* 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). The district court found that appellant failed to establish the prima facie case because in its opinion appellant's conduct in attempting to obtain a statement from Mahoney was not protected activity as it was "bizarre." It relied heavily in reaching that conclusion upon *Garrett v. Mobil Oil Corp.,* 531 F.2d 892 (8th Cir.), *cert. denied,* 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976) (*Garrett*), and *E.E.O.C. v. Shoney's, Inc.,* 536 F.Supp. 875 (N.D.Ala.1982) (*Shoney's*). The district court dealt with neither the second nor third element of a retaliatory discharge case. Consequently, it is unclear whether this was a concession as to their existence or whether the district court found that it was unnecessary for either the second or third elements to be discussed because of its disposition of the protected activity claim and its conclusion that appellant's conduct was bizarre.

There seems to be no question, at least in my opinion, that appellant's discharge grew out of his efforts to obtain a statement from Mahoney for his immediate pending EEOC factfinding conference. If appellant's efforts in this regard were reasonable he would be engaged in statutorily protected activity. In examining appellant's conduct in this context, the district court determined that his actions in pursuing those protected activities were so "bizarre" as to remove him from that protection.

Turning to the timely complaint of retaliation, based on the plaintiff's conduct in January 1983, there is a strong chronological connection between the incident with Rhonda Mahoney and the pendent EEOC complaint. Ms. Mahoney's testimony is convincing, however, that she became deeply offended and even fearful when plaintiff was grossly persistent in his attempts to obtain a revised witness statement from her. There is nothing to indicate that she would have objected or that defendants would have taken adverse action if plaintiff had limited his contacts to reasonable bounds. Plaintiff had become disruptive and almost frantic in his involvement in his own controversies and grievances. The protection against retaliatory conduct must be generously enforced, but plaintiff cites no authority and I have found none that would protect conduct as bizarre as that under consideration.

*Jackson v. St. Joseph's State Hospital,* Civ. No. 84-6127, at 3-4 (W.D.Mo. Nov. 14, 1986).

The question then before this court is at what point does an employee/complainant's action cease to be protected under 42 U.S.C. § 2000e-3. This is a question of law, because it was this alone that in the district court's opinion negated appellant's prima facie case and persuaded the district court that appellee should prevail.

In retaliation cases the question before the court is not whether the employee's actions or complaints are wise or justified. Neither is it whether the employer had other nonretaliatory grounds on which they could have acted against the employee, unless the employer can show that these other grounds would have resulted in discharge even absent the protected conduct. *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 416, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979). The ultimate question is, were the employer's actions related to the protected activity? Here the court found that they were and concluded as a matter of law that the prohibition against retaliation did not apply in this case because of the manner which appellant pursued those protected activities. If, and in my opinion it is, this was a conclusion of law, this court's scope of review of that decision is broad, beyond the normal "clearly erroneous" standard utilized with regard to factual questions.

Even if I were to assume for purposes of argument that the question of whether appellant's activity was protected is strictly factual, the evidence still shows that his efforts to clear himself of serious allegations of sexual harassment were not "bi-

zarre"; and, therefore, the court's finding otherwise was clearly erroneous.

Let us now determine by examining appellant's conduct if the manners and methods that he used in conducting his protected activity somehow stripped him of Title VII's protection. The district court likened appellant's conduct to that found unacceptable in *Shoney's* and *Garrett.* In *Shoney's* an employee was discharged after pursuing an EEOC complaint for three days without attending to his job duties during the entire period. In *Garrett* the employee pursued his discrimination complaint by refusing direct orders, leaving her work station and breaking in on a personnel managerial meeting. Appellant concedes that an EEOC complaint does not give the employee "unlimited license" to pursue his or her claims however and whenever they desire. However, appellant's efforts herein to support his EEOC complaint fell far short of "unlimited license." Neither *Shoney's* nor *Garrett* is apposite.

Appellant's total amount of time spent attempting to get a statement from Mahoney was "45 minutes" on January 24, 1983, followed by a "few minutes" later that same day and "a short period" two days later on the 26th. Timewise, appellant's efforts in no way are as egregious as the conduct in *Shoney's* where the employee spent three complete days neglecting his job. Likewise, appellant's efforts to obtain a statement from an employee, Mahoney, who admittedly disliked him, cannot be compared with the employee in *Garrett* who barged in on upper management meetings demanding confrontation. Note Mahoney's cross-examination:

Question: I believe you said he brought this written document and he gave it to you and said you could change it as you saw fit and then sign it, is that correct?

Answer: He laid it on my desk and he was standing to the side of me. I was in my chair and he was standing at the corner of my desk. He said, *will you please read this over and you can make any revisions that you think*

*might be necessary, and then I could have it typed for your signature.*

(emphasis added). (Vol. II, Tr. 356). Query: Does Mahoney's answer describe appellant's conduct as "bizarre?" I think not.

Appellant's efforts to obtain a statement for the EEOC factfinding conference (as the hospital was also doing during the same period) were thus reasonable. It is indeed strange that the district court found appellant's conduct "bizarre" when the witness herself in her written statement to the assistant superintendent, Mr. Farrar, did not describe it as harassment; and Farrar himself when made aware of appellant's conduct merely described it as persistent. [Vol. III, TR. 570].

Appellant's claim that his discharge by appellee violated § 704(a) of the Act, 42 U.S.C. § 2000e-3(a) deserves more than a short shrift. I, too, agree in principle that an employee's conduct in gathering or attempting to gather evidence to support his charge or in defense of charges made against him may be so excessive and so deliberately calculated to inflict needless economic hardship on his employer that the employee would and should lose the protection of § 704(a). However, there is no evidence whatsoever in the present case that the employer was in any way affected or suffered any economic hardship or loss or that its business was in some way obstructed or held up so that it could not continue its everyday operations. There is no dispute that the activity complained of by appellee in reference to appellant's conduct amounts to nothing more than a few conversations over a very short span of time.

Indeed, appellee's argument in support of its defense that appellant's request to Mahoney for her statement was "unreasonable" rests not upon appellant's actions but upon her reaction to his efforts. Appellee refers to Mahoney becoming "angry," "upset" and "fearful" when appellant sought a statement from her for his pending EEOC charge. Yet, nowhere in the record is there any objective evidence that might lead a reasonable employer to believe that Mahoney had just cause for being "angry,"

"upset" or "fearful." Mahoney's reaction to appellant's efforts to obtain from her a statement for his defense can only be explained in terms of her admitted dislike of appellant. [Vol. II, TR. 354]. It strikes me as somewhat singular that the fact that others may have felt uncomfortable when faced with appellant's admittedly persistent efforts to gather support for his EEOC claim should strip him of his Title VII protection.

The district court's characterization of appellant's conduct as the "last straw" puts the entire situation into sharp focus. From the employer's view point during the course of appellant's employment he had filed three complaints alleging employment discrimination with the EEOC and three internal complaints based upon disciplinary actions were taken against him by appellee. The last of the three EEOC complaints involved an allegation that his discharge was retaliatory. Under the totality of the circumstances because of the number of employment and personnel complaints and problems that appellant was presenting, understandably appellee had a right to be annoyed. Not only did appellee have a right to be annoyed, but also appellee had a right if the various allegations of misconduct were shown to be true to discharge appellant. However, appellant's persistent pursuits to vindicate his alleged EEOC complaints do not give appellee a right to retaliate against him by discharge. In other words, while appellee had a right to discharge appellant, it could not discharge him for an improper reason. As soon as appellant's third EEOC complaint was filed, immediately things began to happen and in a very short time appellant was discharged. Under these circumstances the nexus between his filing the complaint and his discharge is obvious. Consequently, I would reverse the judgment of the district court and remand for a new trial on the retaliatory discharge claim.

* Editors Note: This opinion was originally published at 824 F.2d 710. It is published here as corrected.